UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

KENNETH GOLDEN, <u>et</u> <u>al.</u>,

                              Plaintiffs,

                                        <u>REPORT AND</u>
                                        <u>RECOMMENDATION</u>
              - against -              <u>REGARDING DEFAULT</u>
                                        <u>JUDGMENT</u>

EXECUTIVE FUNDING CORPORATION, <u>et</u> <u>al.</u>,
                                        CV 98-7390 (NGG)

                              Defendants.

- - - - - - - - - - - - - - - - - - -X

TO THE HONORABLE JUDGE NICHOLAS G. GARAUFIS

GO, United States Magistrate Judge:

     Plaintiffs Kenneth Golden ("Golden"), Seymour Benenfeld,

Abraham Roth, Frieda Roth, Eli Lieber, and Leah Lieber have sued

defendants Executive Funding Corporation ("Executive Funding"),

and its principal shareholders, Joseph Greenblatt ("J.

Greenblatt") and Max Greenblatt ("M. Greenblatt") (collectively

"the Greenblatts"); Chase Manhattan Bank, N.A. ("Chase"), and its

employee, Charles Hershkowitz ("Hershkowitz") in this action for

damages for violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962(a)-(d), and related

state law claims.  On May 16, 2002, the Honorable Nicholas G.

Garaufis[1] entered an order discontinuing claims as to defendants

Chase and Hershkowitz.  After the Clerk of the Court noted the

default of the Greenblatts and Executive Funding, Judge Garaufis

_____

     [1]This case was re-assigned from the Honorable Charles P.
Sifton to Judge Garaufis on September 1, 2000.

referred this action to me for a report and recommendation on the amount of the default judgment.

This report and recommendation only addresses the claims of plaintiff Golden because he was the only plaintiff to seek and obtain an entry of default.

PERTINENT FACTS

The facts pertinent to determination of this matter are set forth in the Complaint, the Affidavit of Kenneth Golden Regarding Damages dated October 24, 2002, letters to Court from Clinton Calhoun dated January 14, 2004, April 15, 2005 and April 27, 2005 and the Response of defendant J. Greenblatt to the Affidavit of Kenneth Golden Regarding Jurisdiction and Damages ("Def. Resp."). Defendants M. Greenblatt and Executive Funding did not file any submissions or otherwise respond. Attached as Exhibit 1 to the Complaint is the Amended Complaint filed in a related action, Prime Money Management, Inc v. Douglas R. Hoffman, 95-CV-2269 (NGG)(MDG) (the "Prime Compl."). Similarly, J. Greenblatt incorporates by reference his opposition to the Prime Money Management plaintiffs' motion for default judgment.

The claims in this action arise from a scheme, allegedly masterminded by J. Greenblatt, to defraud plaintiffs by promising guaranteed rates of return for their investment in short term, high interest mortgages in New York City real estate. The Greenblatts allegedly used the funds to perpetuate the fraudulent investment scheme and for their own personal use.

As more specifically described in the Complaint,[2] plaintiff Golden heard a discussion on a radio program about an investment opportunity with the Greenblatts' company, Executive Funding. Complaint ("Comp.") at ¶ 31. Golden called the telephone number announced on the radio program. Id. The Greenblatts later separately visited Golden at his home in Florida and persuaded him to invest in the scheme. Id. at ¶ 31. The Greenblatts described an investment opportunity in which investors' money would be loaned to property owners for capital improvements or used to buy existing mortgages. Id. at ¶ 13. They also stated that the loans would be secured by first mortgages on property worth at least twice the amount of the loan. Id. J. Greenblatt, in his capacity as a lawyer, would service the loans and enforce the terms of the loans. Id. at ¶ 17. His father, Max Greenblatt also of Executive Funding, would identify mortgagable properties and oversee the rehabilitation of the properties. Id. at ¶ 18.

The Greenblatts asserted that investments would provide returns of 12% to 16%. Id. at ¶ 13. They further asserted that the mortgage loans would be paid back in three years or less and would be for a sum not to exceed 50% of the appraised value of

---

[2] The plaintiffs in the Prime Money Management action assert virtually identical claims against the three defaulting defendants in this action, as well as many other defendants. The Prime Compl. contains similar and additional allegations regarding the scheme to defraud which gave rise to the claims in both actions. Most of the allegations in the Prime Compl. will not be repeated herein as they are discussed more fully in a Report and Recommendation filed on January 14, 2005 on the amount of default damages to be assessed against J. Greenblatt and the Memorandum and Order of the Honorable Nicholas G. Garaufis filed on March 14, 2005 ("Prime Dec.") adopting the report and recommendation.

the property securing the loan. Id. The Greenblatts represented that Executive Funding guaranteed monthly interest payments earned on the mortgages and the return of the principal investment. Id. at ¶ 19.

In reliance on the statements made by the Greenblatts, Golden invested money in the scheme. Id. at ¶ 32. Between January 31, 1994, and January 19, 1995, Golden sent 15 checks totaling $610,000 to invest with the Greenblatts as follows, id. at ¶ 34:

| Amount | Payment Date |
|--------|--------------|
| $75,000 | 1/31/94 |
| $75,000 | 2/13/94 |
| $75,000 | 3/3/94 |
| $75,000 | 4/1/94 |
| $6,800 | 4/19/94 |
| $43,200 | 4/19/94 |
| $25,000 | 5/19/94 |
| $75,000 | 6/27/94 |
| $50,000 | 7/7/94 |
| $25,000 | 7/20/94 |
| $22,000 | 9/8/94 |
| $17,000 | 9/23/94 |
| $26,000 | 11/14/94 |
| $7,000 | 12/5/94 |
| $13,000 | 1/19/95 |

The date on which the below described investor package was sent, the amount of the mortgage and the address of the property said to be involved is as follows, id. at ¶¶ 35-43:[3]

| Investor Package Date | Amount | Property |
|---|---|---|
| 2/4/94 | $75,000 | 1233 Bushwick Ave., Brooklyn |
| 3/4/94 | $75,000 | 504 West 146th St., N.Y. |
| 3/18/94 | $75,000 | 124 Malcolm X Blvd., Brooklyn |
| 4/11/94 | $75,000 | 760 MacDonough St., N.Y. |
| 5/2/94 | $61,000 | 1911 Atlantic Ave. & 996 Herkimer St., Brooklyn |
| 6/29/94 | $14,000 | 2365-2367 Dean St., Brooklyn |
| 8/26/94 | $75,000 | 122-40 & 122-46 Rockaway Blvd., Brooklyn |
| 9/12/94 | $5,000 | 422 Cleveland St., Brooklyn |

---

[3] Although the purported mortgages total only $525,000 and Golden alleges he invested $610,000, this discrepancy is immaterial since Golden alleges that some of the mortgage transactions were ficticious.

| 9/13/94 | $70,000 | 998 Tinton Ave., Brooklyn |
|---------|---------|---------------------------|

In addition, Golden's name was listed as mortgagee on a mortgage for a property at 63 West 119th Street although Golden was never notified of that fact by Executive Funding. <u>Id.</u> at ¶ 44.

The investor packages mailed to Golden, as well as other plaintiffs, contained a letter from Executive Funding signed by Joseph Greenblatt or from Joseph Greenblatt on letterhead identifying him as an attorney. Prime Comp. at ¶ 66. The letter included the amount of the mortgage, the mortgagor or assignor, the address of the property involved, and the amount of monthly interest payments. The letter also stated that the mortgage or the assignment of a mortgage was being recorded in the Office of the Register in the county in which the property was located. <u>Id.</u> Included with the letter were some or all of the following documents: a copy of the promissory note (in which the property owner promised to pay plaintiffs certain amounts care of Joseph Greenblatt), the mortgage or assignment of a mortgage, the re-execution agreement (in which the property owner agreed to sign any necessary documents not yet signed), and the assignment of rent (as collateral). <u>Id.</u>

However, contrary to the defendants' representations, some of the above described mortgage transactions were fictitious. Comp. at ¶ 14. Other mortgages were not valid because defendants did not pay the borrowers the entire amount of the mortgage loan. <u>Id.</u> Some of the original mortgages or assignments of mortgages

were not properly recorded.  Id.  Other mortgages naming plaintiffs as the lender were assigned to a third party without plaintiffs' knowledge or consent.  Id.  Still other mortgages were not secure investments because the value of the property was less than twice the amount of the loan or because the other collateral used to secure the loan was insufficient or non-existent.  Id.

Most of plaintiffs' money was converted by Executive Funding, Joseph Greenblatt, and Max Greenblatt for their personal use.  Id. at ¶¶ 14-15.  Some of plaintiffs' money was also used to make purported interest payments to other investors.  Id. at ¶ 15.

Defendant Hershkowitz received compensation for his role in the scheme.  Id. at ¶¶ 15, 20.  Hershkowitz and other senior employees at Chase knew that J. Greenblatt and Executive Funding lacked sufficient funds in their Chase accounts to cover all of the checks written on those accounts.  Id. at ¶¶ 20-24. Hershkowitz and Chase helped conceal this fact from the investors by permitting J. Greenblatt and Executive Funding to write and cash checks on insufficient funds and to overdraw their accounts, including J. Greenblatt's escrow accounts, by hundreds of thousands of dollars, in violation of Chase's internal guidelines and regulations and applicable banking law.  Id. at ¶ 20.  Chase and Hershkowitz also permitted J. Greenblatt and Executive Funding to select which checks should be paid and which should be dishonored.  Id. at ¶ 23.  Additionally, checks made payable to J. Greenblatt's escrow accounts were allowed to be deposited into

-7-

unrestricted accounts.  Id. at ¶ 21.  When Golden asked for a
financial reference, he was told to contact Chase Manhattan Bank.
Id. at ¶ 32.

In September 1994, Hershkowitz retired from Chase.  Prime
Comp. at ¶ 86.  Within weeks, the scheme collapsed.  Id.  On
November 30, 1998, plaintiffs filed a complaint in the Eastern
District of New York.

In addition to the six plaintiffs herein, there were
numerous other investors defrauded by Greenblatt's scheme.  For
example, in late 1989 or early 1990, J. Greenblatt solicited
money from Rabbi Mayer Leifer of Congregation, which ultimately
invested almost $2,000,000 between 1990 and 1994.  Prime Comp. at
¶¶ 73, 76, 78, 87-144.  Similarly, between February 1994 and
September 1994, after a dinner meeting with J. Greenblatt, Joseph
Schifano and Daniel McCorry ("Schifano and McCorry") made
repeated investments on behalf of investors in Prime Money
Management, Inc.  Id. at ¶¶ 146-149, 156.

As one of the controlling principals of Executive Funding,
J. Greenblatt used the company to make the fictitious mortgage
loans.  Comp. at ¶ 16.  Greenblatt publicized the plan by
advertising in print and appearing on the radio.  Id.  He had
personal contact with Golden, promising that he would service the
loans, enforce the notes and mortgages, and guarantee the payment
of monthly interest installments and the return of his principal
investment.  Id. at ¶¶ 17, 19, 26.  Many of the checks from the
investors were even made out to J. Greenblatt personally.  Id. at
¶ 17.  He deposited investors' checks into his attorney trust

account and other accounts he maintained at defendant Chase and
which defendants Executive Funding, Joseph and Max Greenblatt
controlled. Id. Upon receiving money from Golden, the
defendants would mail the investor packages through the U.S.
Postal Service. Id. at ¶ 35-43.

J. Greenblatt's father, M. Greenblatt, assisted in
organizing Executive Funding and soliciting money. Id. at ¶ 18.
He also personally met with Golden to induce him to invest in the
scheme. Id. at ¶ 31. In addition, Max Greenblatt would identify
mortgagable properties and was represented as overseeing any
required rehabilitation of the properties. Id. at ¶ 18.

Defendants Executive Funding and the Greenblatts continued
to accept investments in the scheme until at least January 1995,
prior to Joseph Greenblatt's arrest. Id. at ¶ 59.

## DISCUSSION

### Legal Standards Governing Default

A default constitutes an admission of all well-pleaded
factual allegations in the complaint, except for those relating
to damages. See Greyhound Exhibitgroup Inc., v. E.L.U.L. Reality
Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S.
1080 (1993); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65
(2d Cir. 1981). Only "in very narrow, exceptional circumstances"
may a court find an allegation not "well pleaded." TWA v.
Hughes, 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds, 409
U.S. 363 (1973); Niles v. Palmer, No. 97 CIV. 7573, 1999 WL
1419042, at *5 (S.D.N.Y. Oct. 22, 1999).

Although a court has discretion to determine whether the facts alleged in a complaint state a valid cause of action, a defaulting party ordinarily cannot contest the merits of the plaintiff's claim absent "indisputable" contradictory evidence. Au Bon Pain, 653 F.2d at 65; TWA, 449 F.2d at 63-64. A default also effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct-- that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged. See Greyhound, 973 F.2d at 159; TWA, 449 F.2d at 69-70. The movant need prove "only that the compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." Greyhound, 973 F.2d at 159.

The court must ensure that there is a basis for the damages specified in a default judgment. In determining damages not susceptible of simple mathematical calculation, Fed. R. Civ. P. 55(b)(2) gives a court the discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence. See Action S.A. v. Marc Rich and Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991), cert. denied, 503 U.S. 1006 (1992); Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989). As long as there is a "sufficient basis from which to evaluate the fairness" of the sum awarded, a court may rely upon detailed affidavits and documentary evidence in determining damages. Fustok, 873 F.2d at 40. The moving party is entitled to all reasonable inferences from the evidence

it offers.  <u>See</u> <u>Au Bon Pain</u>, 653 F.2d at 65; <u>Directv, Inc. v.</u>
<u>Hamilton</u>, 215 F.R.D. 460, 462 (S.D.N.Y. 2003).

<u>Motion to Strike</u>

     Greenblatt has moved to strike as "surplusage" certain
allegations in the Complaint that refer to plaintiffs and
defendants whose claims have settled.  Def. Resp., Exh. A at 2,
9.  Rule 12(f) of the Federal Rules of Civil Procedure requires a
motion to strike by a party to be brought within 20 days after
service of the pleading to which the motion is directed.  Thus,
Greenblatt's motion should be rejected as untimely.  Prime Dec.
at 6.

     Even assuming that a motion to strike may properly be
brought by a defaulting defendant, this motion has no merit since
Greenblatt would not otherwise have a basis to strike the
allegations.  Prime Dec. at 6.  Under Rule 12(f), the Court may
"order stricken from any pleading any . . . redundant,
immaterial, impertinent or scandalous matter."  Fed. R. Civ. P.
12(f).  Motions to strike are disfavored "and will not be granted
unless it is clear that the allegations in question can have no
possible bearing on the subject matter."  <u>Forschner Group, Inc.</u>
<u>v. B-Line A.G.</u>, 943 F. Supp. 287, 291 (S.D.N.Y. 1996); <u>see</u> <u>Lipsky</u>
<u>v. Commonwealth United Corp.</u>, 551 F.2d 887, 893 (2d Cir. 1987)
("courts should not tamper with the pleadings unless there is a
strong reason for so doing").  The movant must also show that it
is prejudiced by the inclusion of that portion of the pleading.
<u>SEC v. Lorin</u>, 869 F. Supp. 1117, 1120 (S.D.N.Y. 1994).

The allegations at issue are relevant to Golden's claims by providing background information on the same scheme to defraud which "help to establish the continuity and relatedness necessary for plaintiffs to show a pattern of racketeering activity." Burke v. Dowling, 944 F. Supp. 1036, 1072 (E.D.N.Y. 1995) (denying motion to strike allegations describing similar schemes even though plaintiffs did not allege any RICO injury as a result of those schemes). Moreover, since Congregation Beer Moshe obtained an entry of default against Greenblatt in Prime Money Management, Inc. v. Hoffmann, CV 95-2269, prior to settling its claims against him, J. Greenblatt is deemed to have admitted Congregation's well-pleaded allegations. See Greyhound, 973 F.2d at 158. Finally, the allegations regarding the settling defendants are relevant because they are alleged to be RICO co-conspirators with the Greenblatts and Executive Funding. See Prime Dec. at 7.

Determination of Damages, Costs and Attorneys' Fees

    A.   Liability

The Racketeer Influenced and Corrupt Organizations Act, commonly referred to as RICO, provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity..., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

> (b) It shall be unlawful for any person through a pattern of racketeering activity... to acquire or

> maintain, directly or indirectly, any interest in or
> control of any enterprise which is engaged in, or the
> activities of which affect, interstate or foreign
> commerce.
>
> (c) It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity....
>
> (d) It shall be unlawful for any person to conspire to
> violate any of the provisions of subsection (a), (b),
> or (c) of this section.

18 U.S.C. § 1962(a)-(d). Although RICO is a criminal statute, 18 U.S.C. § 1964(c) provides those injured by the conduct delineated in the RICO statute the right to bring a civil suit for triple damages and costs, including attorneys' fees.

A plaintiff seeking to assert a civil RICO claim must first allege the existence of each of the following seven elements of a RICO claim before turning to its second burden: "(1) that the defendant; (2) through the commission of two or more acts; (3) constituting a 'pattern;' (4) of 'racketeering activity;' (5) directly or indirectly invests in, or maintains an interest in, or participates in; (6) an 'enterprise;' (7) the activities of which affect interstate or foreign commerce." Town of West Hartford v. Operation Rescue, 915 F.2d 92, 100 (2d Cir. 1990); Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983). Additionally, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); Moss, 719 F.2d at 17; see West Hartford, 915 F.2d at 100; Communication Opportunity, Inc. v. Davis, No. 97 CV 3604 (NG), 1998 WL 240527, at *1 (E.D.N.Y. Apr. 28, 1998).

-13-

The terms "enterprise," "racketeering activity," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961. The term "enterprise" includes a "legal entity" or an association-in-fact that is not a legal entity. 18 U.S.C. § 1961(4). "Racketeering activity" is defined as any act indictable under an array of federal criminal statutes, including the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343. See 18 U.S.C. § 1961(1). To constitute a "pattern of racketeering activity," there must be at least two predicate acts meeting the definition of racketeering activity. 18 U.S.C. § 1961(5).

## RICO Enterprise

Plaintiffs' submission amply establishes that the Greenblatts and Executive Funding are liable for violating RICO, 18 U.S.C. § 1961. In claim three of the Complaint, Golden asserts that all defendants conspired to, and did, in fact, conduct and participate in the affairs of an enterprise, defendant Executive Funding, or, alternatively, an association-in-fact of defendants, in violation of section 1962(c) and (d). J. Greenblatt argues that claim three should be dismissed[4] because "plaintiffs have failed to allege a RICO 'enterprise' sufficiently distinct from the RICO 'person.'" See Def.'s Resp.,

_____

[4]Since default has been entered against J. Greenblatt, his attempt to argue for dismissal is late. Nonetheless, this Court will consider the arguments in determining the propriety of entering a judgment by default. However, inferences will be drawn in favor of plaintiff rather than the defaulting defendants.

-14-

Exh. A at 5-6. However, Golden has adequately pleaded an "enterprise" because an association-in-fact is easily inferred from the predicate acts alleged in the Complaint, and even if an association-in-fact did not exist, the Complaint alleged that the enterprise is Executive Funding.

In order to establish liability under § 1962(c), a plaintiff must allege and prove the existence of two distinct entities, a person and an enterprise. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087 (2001). As the Second Circuit explained, "linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise,' particularly when the statute explicitly defines 'person' to include 'any individual'... and defines 'enterprise' to include a 'corporation.'" Id. (quoting 18 U.S.C. § 1961(3), (4)). Moreover, "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." Id. at 163. Here, contrary to J. Greenblatt's argument, see Def. Resp., Exh. A at 5, Greenblatt is not alleged to be an enterprise; rather Greenblatt is alleged to be the "person" who conducted the affairs of the "enterprise," Executive Funding, a separate entity, through a pattern of racketeering activity. Comp. at ¶¶ 83-85.

Pattern

        J. Greenblatt further argues that plaintiffs have failed to
allege a "pattern" of racketeering acts as required by section
1962(c).  The "pattern" element may be satisfied by either
closed-ended or open-ended continuity.  H.J. Inc. v. Northwestern
Bell Tel. Co., 492 U.S. 229, 241-42, 109 S.Ct. 2893 (1989).  "A
party alleging a RICO violation may demonstrate continuity over a
closed period by proving a series of related predicates extending
over a substantial period of time."  Id.  In determining whether
closed-ended continuity exists, courts consider several factors,
including: "the length of time over which the alleged predicate
acts took place, the number and variety of acts, the number of
participants, the number of victims, and the presence of separate
schemes."  GICC Capital Corp. v. Technology Fin. Group, Inc., 67
F.3d 463, 467 (2d Cir. 1995) (citations omitted).  Defendants'
activities must be more than "isolated or sporadic."  Id.

        Here, the Greenblatts are alleged to have committed over
fifty predicate acts of mail and wire fraud between May 1990 and
November 1994.  The Greenblatts induced investors to make
investments through Executive Funding by making false
representations regarding the security and profitability of the
investment and mailed deceptive investor packages to the
plaintiffs.  Instead of investing plaintiffs' money, the
Greenblatts converted it for their own use and for use in
furtherance of the enterprise.  These allegations of a continuous
and long term string of numerous related fraudulent acts suffices

                              -16-

to meet the pattern element in a RICO claim.  <u>See</u> Prime Dec. at
7.

<u>RICO Conspiracy under § 1962(d)</u>

Next, J. Greenblatt argues that plaintiffs' section 1962(d)
conspiracy claim must be dismissed because the allegations are
conclusory.  J. Greenblatt contends that the complaint does not
sufficiently allege a conspiratorial agreement nor that
Greenblatt actually committed predicate acts in furtherance of a
pattern of racketeering activity.

To state a claim for a RICO conspiracy under section
1962(d), plaintiff must allege facts implying an agreement
involving each of the defendants to commit at least two predicate
acts.  <u>See</u> <u>Hecht v. Commerce Clearing House, Inc.</u>, 897 F.2d 21,
25 (2d Cir. 1990).  A plaintiff need not produce proof of the
actual oral or written conspiratorial agreement between the
defendants.  Rather, "[a] defendant's 'agreement' may be
manifested by an assent 'to commit predicate acts of
racketeering' and can also be inferred from circumstantial
evidence of the defendant's status in the enterprise or knowledge
of the wrongdoing."  <u>First Interregional Advisors Corp. v. Wolff</u>,
956 F. Supp. 480, 488 (S.D.N.Y. 1997); <u>see</u> <u>Trautz v. Weisman</u>, 819
F. Supp. 282, 289-90 (S.D.N.Y. 1993); <u>Morrow v. Black</u>, 742 F.
Supp. 1199, 1208 (E.D.N.Y. 1990).  Unlike pleading fraud,
conspiracy is measured under the liberal pleading requirements of
Fed. R. Civ. P. 8(a).  <u>See</u> <u>Hecht</u>, 897 F.2d at 26 n.4.

The Complaint contains ample circumstantial evidence that
defendants had a conspiratorial agreement with J. Greenblatt to
commit numerous predicate acts of mail and wire fraud.  Indeed,
the Complaint details how the defendants participated in the
substantive RICO violation.  The allegations in the Complaint
give rise to an inference that defendants had reached an
agreement as to the commission of certain predicate acts.  At the
center of this agreement, the Greenblatts misrepresented material
facts with respect to the mortgage investment scheme, mailed
deceptive investor packages, and converted plaintiffs' money for
their own use and to maintain the scheme.

Reliance

J. Greenblatt argues that the complaint fails to allege any
misrepresentations by Greenblatt or that plaintiffs reasonably
relied on any alleged misrepresentations.  Where mail or wire
fraud is the predicate act for a civil RICO claim, a plaintiff is
required to show "reasonable reliance" on the misrepresentations.
See Bank of China, New York Branch v. MBM LLC, 359 F.3d 171, 176
(2d Cir. 2004); Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498,
2000 WL 420546, at *4 (S.D.N.Y. Apr. 18, 2000).  Here,  J.
Greenblatt was the main spokesperson for Executive Funding with
respect to the mortgage investment scheme that he promoted
knowing the scheme was completely bogus.  Besides inducing
plaintiffs to make investments through Executive Funding with
false representations, the Greenblatts misled investors into
thinking that the investments were secure by clothing

transactions with the appearance of regularity. Comp. at ¶¶ 17, 19, 20, 24, 35-43. Among the actions they took to deceive investors and prevent them from inquiring further into the fraudulent scheme was to send investor packages containing investment documents involving mortgage transactions that were fictitious or mortgages that were not recorded or were on properties of insufficient value to secure the loan. <u>See</u> Prime Comp. at ¶ 66. They conspired with attorney Douglas Hoffman to maintain the fraudulent scheme by having him represent to investors that Executive Funding guaranteed the payment of monthly interest installments and the return of their principal investment. <u>Id.</u> at ¶ 19. They conspired with Hershkowitz at Chase to falsely verify the financial worthiness of Greenblatt and Executive Funding. <u>Id.</u> at ¶ 20. Drawing all reasonable inferences from these well pled allegations, this Court finds there is no question of reasonable reliance.

<u>Proximate Causation</u>

J. Greenblatt further argues that plaintiffs' allegations fail to satisfy RICO's causation requirement. Section 1964(c) provides, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter . . . may sue . . . in any appropriate United States district court." 18 U.S.C. § 1964(c). Plaintiffs must be able to show that their injuries were "proximately caused by a pattern of racketeering activity violating [section] 1962 or by individual RICO predicate acts." <u>Lerner v. Fleet Bank, N.A.</u>, 318

F.3d 113, 122-23 (2d Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 1012 (2003);
<u>Hecht</u>, 897 F.2d at 23.  Moreover, "the plaintiff must have
suffered a direct injury that was foreseeable." <u>Baisch v.</u>
<u>Gallina</u>, 346 F.3d 366, 373-74 (2d Cir. 2003); <u>see</u> <u>Lerner</u>, 318
F.3d at 123.

Upon a defendant's default, as here, proximate causation is
irrefutably established when it is properly alleged in the
complaint.  <u>Greyhound</u>, 973 F.2d at 159.  In their complaint,
plaintiffs allege that the Greenblatts used wire communications
and mail to make misrepresentations which induced plaintiffs to
invest in the fraudulent mortgage scheme.  Comp. at ¶¶ 13-19, 31-
32, 34-35.  These and other allegations regarding the
Greenblatts' actions more than suffice to establish that the
Greenblatts proximately caused financial injury to plaintiff.
<u>See</u> Prime Dec. at 10; <u>see</u> <u>also</u> <u>Metromedia v. Fugazy</u>, 983 F.2d
350, 368 (2d Cir. 1992).  Additionally, plaintiffs were the
intended and actual victims of the Greenblatts' scheme to
defraud.  <u>See</u> <u>Baisch</u>, 346 F.3d at 375 ("The defendants
specifically targeted Baisch as their victim allegedly by taking
his loans under false pretenses and consciously creating a high
risk of defaulting on those loans"); <u>Lerner</u>, 318 F.3d at 124
("the reasonably foreseeable victims of a RICO violation are the
targets, competitors and intended victims of the racketeering
enterprise").

<u>State Law Fraud</u>

J. Greenblatt also challenges the viability of plaintiffs' state law claims for fraud.  Since the elements of a claim of common law fraud are identical to the elements of the predicate acts of wire fraud and mail fraud with respect to plaintiffs' RICO claims, plaintiffs are also entitled to recover on their state law fraud claims.  <u>S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.</u>, 84 F.3d 629, 633 (2d Cir. 1996) (quoting <u>Katara v. D.E. Jones Commodities</u>, 835 F.2d 966, 970-71 (2d Cir. 1987)) (to plead a New York common law fraud claim, plaintiff must allege "a material false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff").  However, plaintiffs are not entitled to a separate additional recovery for their state law claims, <u>see</u> <u>Phelan v. Local 305 of the United Association of Journeymen</u>, 973 F.2d 1050, 1063 (2d Cir. 1992), but may recover pre-judgment interest on their damages, as discussed below.

<u>Usury</u>

J. Greenblatt contends that Golden's loans may have been usurious under New York law because Golden received an origination fee/rebate of 4 points for each loan in addition to returns of between 12% and 16% promised to investors on their investments as alleged in the Complaint.  Def. Resp. at 3.

While he is correct that New York's civil usury statute operates to void loans of less than $250,000 with interest in

excess of 16%, see N.Y. Gen. Oblig. Law § 5-501, 5-511; N.Y. Banking Law § 14-a, J. Greenblatt's attempt to forward such an argument is, at best, audacious, given his role in the fraudulent scheme at play here. Even if Golden had received a payment amounting to four percent of some or all of the loans made with funds that Golden invested (assuming loans had, in fact, been made), it was J. Greenblatt and others at Executive Funding who arranged for the loans in the first place and made payments to Golden. Even if J. Greenblatt had standing to claim usury to void any loan allegedly held by Golden, J. Greenblatt's vague allegations are not sufficient to meet the "substantial burden of proof to be borne by the borrower which is only satisfied by clear and convincing evidence of each element of usury, including usurious intent." Freitas v. Geddes Savings & Loan Assoc'n, 63 N.Y.2d 254, 260-61, 481 N.Y.S.2d 665, 670 (1984). J. Greenblatt has not come close to meeting that burden.

Standing

J. Greenblatt argues that Golden lacks standing because Golden alleged that some of the mortgage interests he acquired were placed in trust for his parents. However, the Complaint alleges that Golden invested his own money in the scheme and is the person who was defrauded by defendants. Even though the funds invested may have been secured by mortgages held in trust for the benefit of others, Golden clearly has suffered from the loss of his investment. This is sufficient to constitute the "injury-in-fact" which confers standing to sue. See Motorola

Credit Corp. v. Uzan, 388 F.3d 39, 55 (2d Cir. 2004); McCormick
v. The School District of Mamaroneck, 370 F.3d 275, 284 (2d Cir.
2004).  In any event, Golden, as the owner of the funds used to
invest in mortgages that may have been held in trust, would have
a right to bring suit in his own name.  See Fed. R. Civ. P.
17(a).

>          B.    Calculation of Damages

J. Greenblatt argues that plaintiffs' damages are unknown
because the Complaint does not specify what problems exist with
each mortgage.  For example, the amount of damages to which
plaintiffs are entitled may vary depending on whether a mortgage
is non-existent or has a title defect.  Here, plaintiffs allege
that many of the mortgage transactions were fictitious.
Obviously, plaintiffs cannot recover their investments from non-
existent borrowers.  More importantly, Golden has provided
information regarding both the amounts of the investments and any
recoupments and other payments received, as further discussed
below.  Thus, his damages at this time are known.

Apportionment of Liability

J. Greenblatt complains that plaintiffs do not distinguish
between damages caused by Greenblatt and other defendants.  This
argument is specious because Greenblatt is jointly and severally
liable with his co-conspirators for any damages caused by the
RICO violations.  See Prime Dec. at 10-11; Empire Blue Cross and
Blue Shield v. Finkelstein, 887 F. Supp. 473, 480 (E.D.N.Y.

1995); <u>Interpool Ltd. v. Patterson</u>, No. 89 Civ. 8501, 1994 WL 665850, at *3 (S.D.N.Y. Nov. 28, 1994).

18 U.S.C. § 1964(c) provides a plaintiff "injured in his business or property by the conduct" proscribed by the RICO statute the right to bring a civil suit for damages caused by the RICO violation. <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096, 1100 (2d Cir. 1988); 18 U.S.C. § 1964(c). The damages should be "sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct." <u>Bankers Trust</u>, 859 F.2d at 1106. The appropriate measure of damages proximately caused by the Greenblatts' RICO violations is ordinarily the total amount plaintiff invested in the Greenblatts' scheme. <u>See</u> <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 768-69 (2d Cir. 1994) ("general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud"); <u>Fleischhauer v. Feltner</u>, 879 F.2d 1290, 1300 (6th Cir. 1989) (RICO plaintiffs entitled to the amounts they actually invested); <u>In re Crazy Eddie Sec. Litig.</u>, 948 F. Supp. 1154, 1165 (E.D.N.Y. 1996) (out-of-pocket losses are rule for damages caused by common law fraud). Recovery of Golden's investment would return him to the position he would have been in had he not invested with the Greenblatts. Golden does not seek to recover more than his principal investment.

Thus, in order to return Golden to the position he would have been in had he not invested in the scheme, Golden's damages consist of his principal investment of $610,000, <u>see</u> Golden Affidavit dated October 24, 2002 ("10/24/02 Golden Aff.") at ¶ 3,

less any interest payments he received. Because Golden was able to recoup $58,393 in interest payments, his net loss is $551,607. <u>Id.</u>

Pre-judgment Interest

Plaintiffs seek pre-judgment interest on their RICO damages. Although the RICO statute does not specifically provide for the award of pre-judgment interest, the district court has discretion to make such an award. <u>See</u> <u>Abou-Khadra v. Mahshie</u>, 4 F.3d 1071, 1084 (2d Cir. 1993); <u>Wickham Contracting Co. v. Local Union No. 3</u>, 955 F.2d 831, 835 (2d Cir. 1992); <u>Panix Prods., Ltd. v. Lewis</u>, No. 01 Civ. 2709, 2003 WL 21659370, at *3 (S.D.N.Y. July 15, 2003). Where treble damages are adequate to compensate plaintiffs, an award of pre-judgment interest would generally be inappropriate. <u>TWA</u>, 449 F.2d at 80; <u>Panix Prods.</u>, 2003 WL 21659370, at *3; <u>Group III Capital, Inc. v. Parasol Group, Ltd.</u>, No. 00 Civ. 6860, 2003 WL 1948801, at *3 (S.D.N.Y. Apr. 23, 2003); <u>Securitron Magnalock Corp. v. Schnabolk</u>, No. 89 Civ. 6731, 1994 WL 576897, at *1 (S.D.N.Y. Oct. 19, 1994); <u>Bingham v. Zolt</u>, 810 F. Supp. 100, 101 (S.D.N.Y. 1993). Golden has not demonstrated why he is not adequately compensated by a trebled damage award. Therefore, no pre-judgment interest will be awarded under RICO.

However, since plaintiffs have asserted well-pleaded pendent state claims for fraud, Golden is entitled to pre-judgment

interest on his pendent claim under New York law.[5]  See Prime
Dec. at 19 (citing Olcott v. Delaware Flood Co., 327 F.3d 1115
(10th Cir. 2003), cert. denied, 540 U.S. 1089 (2003) and Tosto v.
Zelaya, No. 99 Civ. 11864, 2003 U.S. Dist. LEXIS 8085, at *23-*24
(S.D.N.Y. May 12, 2003)).  Under New York law, awarding pre-
judgment interest on damages awarded for fraud is mandatory.  See
Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp., 801 F.2d
13, 28 (2d Cir. 1986); Mallis v. Bankers Trust Co., 717 F.2d 683,
693-95 (2d Cir. 1983); Tosto v. Zelaya, No. 99 Civ. 11864, 2003
U.S. Dist. LEXIS 8085, at *23-24 (S.D.N.Y. May 12, 2003) (pre-
judgment interest on recovery for fraud).

        Whether pre-judgment interest is awarded under federal or
state law, federal courts have ordinarily looked to state law in
determining the appropriate interest rate.  See SEC v. Musella,
748 F. Supp. 1028, 1032 (S.D.N.Y. 1989), aff'd, 898 F.2d 138
(1990).  In the absence of a written contract which clearly
specifies a different rate, pre-judgment interest should be
awarded at the statutory rate of 9% authorized by CPLR section
5004.  Marine Management, Inc. v. Seco Management, Inc., 176
A.D.2d 252, 574 N.Y.S.2d 207 (2d Dep't 1991), aff'd, 80 N.Y.2d

---

        [5] Implicit in this finding is the assumption that New York
substantive law applies to this issue, at least with respect to
the fraud claims in their entirety and the determination of pre-
judgment interest below.  Since no party has raised any choice of
law issue, the parties, by their conduct, have acquiesced to the
application of New York substantive law.  See Wm. Passalacqua
Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131,
137 (2d Cir. 1991).  Because the plaintiffs are entitled to pre-
judgment interest on their claims of common law fraud, I need not
decide whether pre-judgment interest should be awarded on other
state law claims.  See In re Crazy Eddie Sec. Litig., 135 F.R.D.
39, 41 (E.D.N.Y. 1991).

886, 587 N.Y.S.2d 900 (1992). New York CPLR section 5001(b),
which governs awards of pre-judgment interest, provides that:

> Interest shall be computed from the earliest
> ascertainable date the cause of action existed, except
> that interest upon damages incurred thereafter shall be
> computed from the date incurred. Where such damages
> were incurred at various times, interest shall be
> computed upon each time from the date it was incurred
> or upon all of the damages from a single reasonable
> intermediate date.

Pre-judgment interest on New York state claims is available as of
the date the cause of action accrued. See Tosto, 2003 U.S. Dist.
LEXIS 8085, at *23-24 (pre-judgment interest on recovery for
fraud is available when the cause of action accrues). Where
damages were incurred at various times, courts have wide
discretion in choosing a reasonable date from which to calculate
interest. See Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 91 (2d
Cir. 1998); Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d
Cir. 1994). Under New York law, pre-judgment interest is
calculated on a simple interest basis. See Marfia, 147 F.3d at
90; Novomoskovsk Joint Stock Co v. Revson, No. 95 CIV. 5399, 1999
WL 767325, at *3 (S.D.N.Y. Apr. 29, 1999).

Golden invested in several real estate properties over the
course of one year, but Golden has not offered any calculations
as to the starting date(s) from which pre-judgment interest
should accrue. This Court finds that the date of Golden's last
payment to Greenblatt is a reasonable starting date to use. See
In re Crazy Eddie, 948 F. Supp. at 1168 (defrauded investors
would receive pre-judgment interest calculated from last purchase

of stock).  Thus, pre-judgment interest of 9% should be awarded from January 19, 1995 to the present.  Compl. at ¶ 34.

The interest calculation should be adjusted to reflect each set-off received.  However, Golden did not provide the date that he received the first distribution from the Special Master.  This Court recalls from settlement discussions with the parties in the <u>Prime Money Management</u> action regarding their settlement with Chase and Hershkowitz that no distribution had been received as of the time of negotiations in May 1999.  Since Golden bears the burden of proving damages, the first distribution or distributions are deemed to have been received as of May 1, 1999.

## Set-Offs

When a plaintiff settles with one defendant, the non-settling defendants are "entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the non-settling defendant as long as both the settlement and judgment represent common damages."  <u>Singer v. Olympia Brewing Co.</u>, 878 F.2d 596, 600 (2d Cir. 1989); <u>see</u> <u>In re Masters Mates & Pilots Pension Plan</u>, 957 F.2d 1020, 1031 (2d Cir. 1992).  In RICO cases, the Second Circuit has applied a "one satisfaction rule" affording a non-settling defendant a reduction equal to the amount of a prior settlement.  <u>Singer</u>, 878 F.2d at 600; <u>see</u> <u>also</u> <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.</u>, No. 93 CIV. 6878 (LMM), 94 CIV. 2713 (LMM), 2000 WL 1364272, at *2-*3 (S.D.N.Y. Sept. 20, 2000).  In <u>McDermott, Inc. v. AmClyde and River Dan Castings, Ltd.</u>, 511 U.S. 202 (1994), the Supreme Court

endorsed an alternative proportionate share approach in which
"[t]he money paid [by a settling defendant] extinguishes any
claim that the injured party has against the other tortfeasors by
the amount of the equitable share of the obligation of the
released tortfeasor." 511 U.S. at 209. Nonetheless, district
courts in the Second Circuit have held that <u>Singer</u> is still
controlling because the Second Circuit has not specifically
addressed the appropriate judgment-reduction method since the
Supreme Court decision in <u>McDermott</u>. <u>See</u> <u>Twenty-First Century</u>
<u>L.P. v. Labianca</u>, No. 92 Civ. 2913, 2001 WL 761163, at *6 n.4
(E.D.N.Y. May 2, 2001); <u>Bank Brussels</u>, 2000 WL 1364272, at *2-*3.
Moreover, unlike <u>McDermott</u>, an admiralty case in which the jury
apportioned damages among four corporate defendants, this case is
brought under RICO, a statute that does not confer upon a
culpable defendant a right either to contribution or
indemnification. <u>See</u> <u>Sequa Corp. v. Gelmin</u>, 851 F. Supp. 106,
108 (S.D.N.Y. 1994); <u>Friedman v. Hartmann</u>, 787 F. Supp. 411,
415-18 (S.D.N.Y. 1992); <u>O & K Trojan, Inc. v. Municipal &</u>
<u>Contractors Equip. Corp.</u>, 751 F. Supp. 431, 433-34 (S.D.N.Y.
1990). The one satisfaction rule is also more appropriate than
apportionment of damages since the Greenblatts and Executive
Funding have wilfully defaulted and impeded determination of
liability. <u>See</u> <u>Twenty First Century</u>, 2001 WL 761163, at *6 n.4;
<u>Bank Brussels</u>, 2000 WL 1364272, at *3; <u>Qualis Care, L.P. v. Hall</u>,
No. 95 Civ. 4955, 1999 WL 683564, at *8 n.6 (S.D.N.Y. Sept. 1,
1999); <u>In re Crazy Eddie</u>, 948 F. Supp. at 1169.

The amount of set-offs against any damages recoverable by
Golden is $255,582, representing the sums of settlement payments
received from defendants Chase and Hershkowitz, and distributions
from a Special Master appointed.  See 10/24/02 Golden Aff. at ¶
5; Letter to Court from Clinton W. Calhoun III dated January 15,
2004 ("1/15/04 Ltr.").  The settlement amounts reflect the actual
payments received, net of attorneys' fees.  See 10/24/02 Golden
Aff. at ¶ 6.  Golden's set-offs are as follows:

> $168,500.00    3/22/02 payment from Chase defs.
> $ 73,080.00    payment from Special Master
> $ 14,002.00    12/1/03 payment from Special Master

Treble Damages

It is undisputed that Golden is also entitled to treble
damages under RICO.  See 18 U.S.C. § 1964(c).  However, the
parties disagree as to whether damages should be trebled before
or after settlement payments are credited.  J. Greenblatt
contends that "[t]he Second Circuit has made clear that
investors' 'damages' are reduced by any recoveries before
trebling damages." Def. Resp. at 6.  On the contrary, generally,
where plaintiffs are entitled to trebled damages under federal
law, courts have upheld the trebling of damages before crediting
settlement payments.[6]  See Singer, 878 F.2d at 601 (where
plaintiff sues multiple defendants for treble damages, settles
with one or more of them, and then prevails against the remaining

---

[6] The cases cited by Greenblatt, First Nationwide Bank v.
Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994) and Stochastic
Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1166 (2d Cir. 1993)
are inapposite.  Both cases concerned plaintiff's lack of
standing under RICO.

defendants, "it is proper to treble the damage award before crediting settlement payments"); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 894 (2d Cir. 1988); New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1086 (2d Cir. 1988); In re Crazy Eddie, 948 F. Supp. at 1169.

Thus, Golden's trebled damages are $1,654,821.

Attorneys' Fees

Under RICO, plaintiff is entitled to recover the "costs of the suit, including a reasonable attorneys' fee." 18 U.S.C. § 1964(c); see Stochastic, 995 F.2d at 1167. Where a statute provides for the award of attorneys' fees to the prevailing party, the Second Circuit authorizes award of fees based on the lodestar method -- that is, multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See LeBlanc-Stemberg v. Fletcher, 143 F.3d 748, 763-64 (2d Cir. 1998); Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997). A party seeking attorneys' fees bears the burden of supporting its claim of hours expended by accurate, detailed, and contemporaneous time records. New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). Hours that are "excessive, redundant, or otherwise unnecessary" should be excluded. Hensley, 461 U.S. at 434.

Plaintiff Golden seeks to recover attorneys' fees of $34,496.30 he paid to counsel Clinton Calhoun, James Fogel, Dennis Woods, Alfred Drangle and Anthony Nardotti. First, to the extent that plaintiff seeks attorneys' fees for work done by

-31-

James Fogel, Dennis Woods, Alfred Drangle and Anthony Nardotti that request is denied because, despite several requests, plaintiff has not submitted any billing records setting forth the nature of the services rendered or the hours expended. As to Briccetti, Calhoun & Lawrence, LLP, the billing records recently submitted reflect 252.45 hours spent on the case through September 30, 2001. <u>See</u> Letter to Court from Clinton W. Calhoun, III dated April 27, 2005 and attached exhibits. The law firm billed Golden for one-third of the amount of hours expended on the case. <u>See</u> <u>id.</u>

It is well established that courts may reduce requested hours or make aggregate percentage reductions where, as in this instance, it is difficult to separate hours billed for specific tasks. <u>Hensley</u>, 461 U.S. at 441; <u>New York State Association for Retarded Children</u>, 711 F.2d at 1148 ("Where adequate contemporaneous records have not been kept, the court should not award the full amount requested"). After examining the time records of Briccetti, Calhoun & Lawrence, LLP, a 15% reduction is appropriate for vague billing entries and attorney conferences. <u>See</u> <u>United State Football League v. National Football League</u>, 887 F.2d 408, 415 (2d Cir. 1989) (approving a percentage reduction of total fee award to account for vagueness in documentation of certain time entries); <u>Schruefer</u>, 2003 WL 21511157, at *3 (10% reduction for imprecise time entries); <u>N.S.N. Int'l Indus. N.V. v. E.I. DuPont de Nemours & Co.</u>, No. 89 Civ. 1692, 1996 WL 154182, at *4 (S.D.N.Y. Apr. 3, 1996) (15% reduction for attorney conferences and vagueness of billing entries). Thus, Briccetti,

-32-

Calhoun & Lawrence's attorneys' fees are reduced by 37.86 hours, leaving 214.59 hours remaining.

Greenblatt contends that plaintiffs' attorneys' fee request is deficient because it does not provide any basis for apportioning attorneys' fees among the plaintiffs in this case. However, the plaintiffs' claims are so closely related that much of Clinton Calhoun's time on the case was spent on tasks that benefitted all plaintiffs. Briccetti, Calhoun & Lawrence apparently charged Golden for only one-third of the time expended on this case, presumably because there are three sets of plaintiffs alleged in the Comp. Because there is no precise way of apportioning Calhoun's work on the case among multiple plaintiffs, I recommend that the Court approve a one-third allocation of attorneys' fees to Golden. Such an allocation is fair and disproportionately lower than Golden's pro rata investment -- Golden contributed 78 percent of the funds invested by all plaintiffs alleged in the Complaint and became the holder of two-thirds of the total number of mortgages invested in by all plaintiffs.

Under the lodestar method, the reasonable hourly rates should be based on the rates "'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" Cruz v. Local Union No. 3, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting Blum v. Stenson, 465 U.S. 886, 896 n. 11, (1984). Determination of the prevailing market rates may be based on evidence presented or a judge's own knowledge of hourly rates charged in the community. See Chambless, 885 F.2d

-33-

at 1059.  In addition, the Court may consider factors such as the attorney's skill and experience and the novelty of the issues. See Wells v. Bowen, 855 F.2d 37, 43 (2d Cir. 1988).  In this regard, courts typically recognize that the size and caliber of a firm will influence the determination of appropriate billing rates.  Pascuiti v. New York Yankees,, 108 F. Supp. 2d 258, 266-67 (S.D.N.Y. 2000) (small firms are subject to a different scale rate than larger firms); Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp.2d 417, 421-22 (S.D.N.Y. 1999) (citing cases); Helbrans v. Coombe, 890 F. Supp. 227, 233 (S.D.N.Y. 1995) (court consideration affected by the size and experience of the firm); Chambless, 885 F.2d at 1059 ("smaller firms may be subject to their own prevailing market rate"); Algie v. RCA Global Communications, Inc., 891 F. Supp. 875, 895 (S.D.N.Y. 1994) ("a movant may obtain higher compensable rates if represented by a large urban firm, since such firms typically charge more per hour to cover a higher overhead"), aff'd, 60 F.3d 956 (2d. Cir. 1995).

Clinton Calhoun's hourly rate for this case is $200.00. Briccetti, Calhoun & Lawrence is a small law firm whose practice areas include civil litigation and corporate investigations.  See www.martindale.com/sp/Martindale/Lawyer_Locator.  Calhoun, a member of the firm, is a 1977 graduate of the University of Virginia School of Law and a former Chief of the Frauds Bureau of the New York County District Attorney's Office.  Id.

Fee awards in recent cases in the Eastern District of New York have ranged from $200 to $275 for partners.  See Stavitsky v. Bd. of Elections in the City of New York, 198 F. Supp. 2d 271,

274 (E.D.N.Y. 2002); <u>Fink v. City of New York</u>, 154 F. Supp. 2d 403, 407 (E.D.N.Y. 2001); <u>Hiller v. County of Suffolk</u>, 199 F.R.D. 101, 109 (E.D.N.Y. 2001). Calhoun's rate is well within the range approved by courts in New York City for small firms. <u>See</u> <u>Figueroa ex rel. Havre v. Savanar Restaurant, Inc</u>., 182 F. Supp. 2d 339, 341 (S.D.N.Y. 2002) (court held a blended rate of $245.00 per hour for a small to medium size firm in Manhattan was reasonable). Accordingly, I find the rate of $200.00 appropriate and recommend that Golden receive an award of attorneys' fees in the amount of $14,306.

Greenblatt also argues that plaintiff has not apportioned his attorneys' fees among the defendants. The allocation of fee liability is a matter committed to the district court's discretion. <u>Koster v. Perales</u>, 903 F.2d 131, 139 (2d Cir. 1990); <u>see</u> <u>Hensley</u>, 461 U.S. at 437. The district court may allocate the fee award between the responsible parties "where the claims against the defendants are separate and distinct or where culpability is significantly unequal." <u>Koster</u>, 903 F.2d at 139. On the other hand, the court may hold the responsible parties jointly and severally liable for the fee award "where the action or inaction of several defendants produces a single indivisible injury." <u>Id.</u> at 140. However, defendants can be held jointly and severally liable for attorneys' fees only if they were jointly and severally liable for the underlying judgment. <u>Id.</u> at 139. In deciding apportionment of liability for legal fees among co-defendants, the court "should 'make every effort to achieve the most fair and sensible solution that is possible.'" <u>Id.</u>

The mortgage scheme at issue was perpetrated by the joint action of defendants and produced a single indivisible injury – loss of plaintiff's investment principal.  Moreover, much of the time Calhoun spent on this litigation involved issues that pertained to all defendants because the issues were interwoven.  Although much of the attorney time was expended after Greenblatt's default, such efforts ultimately resulted in settlements with the other defendants.  Because Greenblatt has benefitted from the offset of settlement payments and, as the mastermind of the scheme to defraud, bears the greatest culpability, it is not unfair to impose joint and several liability for the fee awards.

<u>Costs</u>

Courts should include in attorneys' fees awards "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." <u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 763 (2d Cir. 1998) (quoting <u>United States Football League v. National Football League</u>, 887 F.2d 408, 416 (2d Cir. 1989)).  Such recoverable expenses include postage, photocopying, travel, telephone costs and computerized research expenses.  <u>Id.</u>  Golden has not yet submitted a request for costs but represents that he will submit a bill of costs to the Clerk of Court.

<u>Punitive Damages</u>

I recommend declining to award punitive damages, as Golden has already received treble damages under the RICO statute.  To

award punitive damages as well would result in double recovery. See New York Mercantile Exchange v. Paolo Verrone, et al., No. 96 CV 8988(SAS), 1998 WL 811791, at *2 (S.D.N.Y. Nov. 19, 1998); Bingham, 823 F. Supp. at 1135.

## CONCLUSION

For the foregoing reasons and as set forth in detail in Appendix A, I recommend that judgment be entered against the Greenblatts and Executive Funding awarding $1,823,667.95 in damages to Kenneth Golden with interest on $296,025.00 at $72.99/day from 5/31/05 until entry of judgment, and, attorneys' fees in the amount of $14,306.

A copy of this report and recommendation is being sent via overnight mail to the parties on this date. Any objections to this report and recommendation must be filed with the Clerk of this Court and the Chambers of the Honorable Nicholas G. Garaufis by May 23, 2005. Failure to file timely objections may waive the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED.

Dated:    Brooklyn, New York
          May 6, 2005

                                    /s/
                                    _____
                                    MARILYN DOLAN GO
                                    UNITED STATES MAGISTRATE JUDGE

APPENDIX A
<u>CALCULATION OF DAMAGES FOR GOLDEN</u>

|  |  | Accrued <u>Interest</u> |
|---|---|---|
| <u>Set-offs</u> | | |
| | Interest on $551,607 loss <br> from 1/19/95 to 5/1/99...... <br> (1563 days at $136.01/day) | $212,583.63 |
| *($ 73,080.00) payment on 5/1/99* | Interest on $478,527.00 <br> from 5/1/99 to 3/22/02........ <br> (1056 days at $117.99/day) | $124,597.44 |
| *( 168,500.00) payment on 3/22/02* | Interest on $310,027.00 <br> from 3/22/02 to 12/1/03...... <br> (619 days at $76.45/day) | $ 47,322.55 |
| <u>*( 14,002.00) payment on 12/1/03*</u> | Interest on $296,025.00 <br> from 12/1/03 to 5/31/05....... <br> (547 days at $72.99/day) | <u>$39,925.53</u> |
| *($ 255,582.00) TOTAL SET-OFFS* | | |

**TOTAL INTEREST as of 5/31/05**   $424,428.95

**TREBLED DAMAGES**   $1,654,821.00

**TOTAL SET-OFFS**   <u>($255,582.00)</u>

**TOTAL JUDGMENT**   <u>**$1,823,667.95**</u>